UNITED STATES of America, Appellee,

v.

Donald J. QUINN, Appellant.

No. 76–1113.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1976.

Decided Nov. 3, 1976.

Warren S. Zweiback, Omaha, Neb., for appellant; Roy G. Breeling, Omaha, Neb., on brief.

William E. Zleit, Special Atty., U. S. Dept. of Justice, Kansas City, Mo., for appellee; Daniel E. Wherry, U. S. Atty., Omaha, Neb., and Gary Cornwell, Special Atty., Kansas City, Mo., on brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, HENLEY, Circuit Judge, and DEVITT, Chief District Judge.*

HENLEY, Circuit Judge.

Donald J. Quinn, defendant-appellant, was found guilty by a jury in the United States District Court for the District of Nebraska [1] of the offense of jury tampering in violation of 18 U.S.C. § 1503.[2] Quinn's motion for a new trial was denied, and he was sentenced to imprisonment for a term of two years. He appeals.

The indictment charged that between September 3 and September 19, 1974, the defendant, together with Paul F. Murphy, Dale Murphy and Clarence J. Matya, willfully and corruptly endeavored to obstruct and impede the administration of justice in the case of *United States of America v. Clarence J. Matya, et al.*, D.C.Neb., No. CR–73–0–110, by endeavoring to influence a petit juror in the discharge of the duties of the juror in said case by attempting through Frank J. Ryan to contact and offer

---

* Edward J. Devitt, Chief Judge, District of Minnesota, sitting by designation.

1. The Honorable Albert G. Schatz, United States District Judge.

2. Section 1503 prohibits the obstruction of justice in the federal courts. A number of offenses are defined. One of them is the corrupt endeavoring to influence a federal grand or petit juror in the discharge of his or her duty. The offense is a felony, punishable by a fine of not more than $5,000.00 or imprisonment for not more than five years, or both.

such juror up to $1,000.00 or more for each defendant whom the juror would vote to acquit of the charges in said case.[3]

Jury trial began on December 1, 1975. At the conclusion of the government's case the district court entered judgments of acquittal with respect to the Murphys and Matya. Quinn's motion for a similar judgment was denied. The trial continued as to him and ended on December 23. The materials before us consist of a substantial designated record, 1914 pages of trial transcript, not including closing arguments of counsel, and a number of tape recordings that were played before the jury.

For reversal Quinn contends that he was the victim of entrapment in fact and that on account of alleged outrageous governmental misconduct he was entrapped as a matter of law; that the district court improperly restricted his inquiries into prior relationships between the Federal Bureau of Investigation and one Robert L. Probst; that the district court erred in admitting in evidence the tape recordings above mentioned; that the district court erred in admitting extrajudicial statements of codefendants; that the district court erred in overruling his motion for a mistrial when Frank J. Ryan, mentioned in the indictment, was called to the witness stand and invoked his privilege against self-incrimination in the presence of the jury; and that the district court erred in giving certain instructions to the jury and in refusing to give certain instructions requested by the defendant.

At the risk of some oversimplification, we will state the case as concisely as possible and we will state it in the light most favorable to the government.[4]

During the time with which we are concerned, the defendant resided in Omaha, Nebraska where he operated a bar known as the VIP Lounge. In 1973 Quinn, the Murphys, Matya and others were indicted on charges of having operated a large bookmaking establishment in Omaha in violation of state and federal laws. The defendants in that case went to trial on September 3, 1974, and on September 28 Matya, Quinn and the Murphys were found guilty. They were sentenced to imprisonment.

Mrs. Margaret Probst of Omaha was selected as a member of the Matya jury. She had formerly been married to Robert T. Probst, an Omaha bookmaker, and they had one son, Robert L. Probst, who figures in this case. Robert T. Probst and Mrs. Probst had been divorced for a number of years, and he had died prior to the Matya trial.

Robert T. Probst and Robert L. Probst were well acquainted with Paul and Dale Murphy. Frank J. Ryan, at times described as an "unindicted coconspirator," was also acquainted with Robert T. and Robert L. Probst and with the Murphys.

When the defendants realized that Mrs. Probst was a member of the Matya jury, the defendants in that case with whom we are concerned formed a rather loose plan to approach Mrs. Probst through her son, Robert L. Probst, hereinafter simply Probst, for the purpose of influencing her vote as a juror. The scheme envisioned the possibility of a substantial payment of money to Mrs. Probst. The plan contemplated that Ryan would contact Probst and would serve as an intermediary between him and the defendants, and that Probst would deal directly with his mother.

Let it be said before going further that the parties stipulated that Mrs. Probst was never in fact approached by anyone in an effort to influence her vote.

---

**3.** That case will be referred to as the *Matya* case. The defendants in this case, along with others, were defendants in that case and all were found guilty of having conducted an illegal gambling operation in Omaha, Nebraska, in violation of federal law. Their convictions were affirmed recently by this court. *United States v. Matya*, 541 F.2d 741 (8th Cir. 1976).

**4.** The correctness of the action of the district court in entering judgments of acquittal as to all *defendants save Quinn is perhaps debatable*, and we think that it is certainly debatable as far as Paul Murphy is concerned. However, the question of the correctness of that action is not before us.

Paul Murphy contacted Ryan with the suggestion that if he saw Mrs. Probst, he might "put in a good word for the Murphys." Later, after Ryan had talked with Paul Murphy and with the defendant, Quinn, Ryan made two long distance telephone calls to Probst at the latter's home in Ogallala, Nebraska. In his first conversation with Probst on September 8 Ryan was indefinite in his statements. He was not indefinite in the course of his second call which was made on September 10; in the course of that call he openly suggested that Mrs. Probst be bribed, and requested Probst to come to Omaha to discuss the matter. Quinn had agree to pay the expenses of the trip.

At this point, the whole scheme aborted although Ryan and the Matya defendants did not know it. After agreeing to phone Ryan during the evening of September 10, Probst made a long distance call to Special Agent Edward D. O'Brien of the FBI who was stationed at Omaha. Probst told O'Brien about the calls he had received from Ryan.

The record reflects that Probst had been acquainted with O'Brien for a number of years and had had dealings with him, some of which were of an official nature. Probst was also acquainted with Special Agent Dan Kelly of the Omaha office of the Bureau.

O'Brien caused certain Bureau agents to call on Probst in Ogallala. Probst agreed that he would cooperate with the Bureau in investigating the plan to bribe Mrs. Probst. In the presence of the agents he made a call to Ryan, as Ryan had asked him to do. That conversation which related to the bribery was recorded with the consent of Probst. It is inferable that the agents instructed Probst as to certain things to say and as to certain questions to ask.

On September 12 Probst went to Omaha and held a conference with O'Brien and other agents. He agreed to cooperate further with the Bureau, and he consented both orally and in writing to the recording of telephone conversations that he might make on the instructions of the Bureau and

to be equipped with and use a body recorder whereby his face to face conversations with other persons could be simultaneously recorded and broadcast so that they could be monitored by the agents as they were occurring.

On September 13, 14 and 15 Probst had a series of recorded conversations with Ryan in the course of which they discussed what Ryan thought was a genuine ongoing plan to bribe Mrs. Probst. The plan which evolved was that Probst and Ryan would undertake to obtain $1,000.00 from each of the "minor" defendants in the Matya case, including the Murphys and Quinn. Larger sums were to be extracted from the "major" defendants in that case, including Matya himself. Probst was supposed to pay the bribe directly to his mother. It is interesting to speculate how much of the money to be obtained from the defendants Ryan expected to get for himself and how much of the money he thought that Probst really intended to pay to his mother.

We do not question the validity of Quinn's contention that during these conversations Probst was taking a line dictated by O'Brien and possibly by other agents of the Bureau.

On September 13 Ryan had a conversation with the Murphys in the course of which they manifested little enthusiasm for the deal, although they did not take themselves absolutely out of it. A later conversation with Paul Murphy at his home was perhaps more encouraging.

On the same day Ryan talked with Quinn briefly on three occasions, once in the lobby of the Federal Building in Omaha where the Matya trial was going on, once in a restaurant where Quinn was having lunch, and again at the VIP Lounge in the evening. Ryan seemed to have been particularly interested at that moment in collecting the expense money that had been promised to Probst; the amount was set at $400.00. Quinn was busy and declined to talk to Ryan at any length. However, he indicated that he would make the payment the following day.

On September 14 Probst, Quinn and Ryan had a conversation at a point near Quinn's place of business. Probst falsely told Quinn that Probst had been in touch with his mother, and that she had agreed to go along with the arrangement. In the course of that conversation Quinn paid Probst $400.00, and Probst gave Ryan $100.00 of it.

On September 15 Probst and Ryan had another conversation, after which Probst dropped out of the picture. By that time the Bureau had evidently decided that Ryan was involved to the extent that he could be taken into custody, confronted with his complicity in the scheme, and induced to cooperate with the Bureau in the further development of the case against the Matya defendants.

During the early afternoon of September 15 Ryan was arrested in fact, if not in form, by Special Agent Kelly. He was patted down for weapons, advised of his *Miranda* rights, and taken to the FBI office for an interview of several hours which was conducted by Special Agents O'Brien and Kelly.[5]

Prior to the beginning of the interview proper Ryan was again advised of his rights. The interviewing agents then told him that they were aware of the plan to tamper with Mrs. Probst, and that they knew that Ryan was deeply involved in it and that he was subject to criminal prosecution and imprisonment. Ryan testified that he was told that he was subject to prosecution on plural counts and to imprisonment of up to thirty years; O'Brien denied that any such representation was made.

Thereafter, the agents practiced a ruse which deceived Ryan to some extent though not entirely. The agents played for Ryan a tape which purported to be a recording of a conversation between two unidentified men about the $400.00 payment that Quinn had made to Probst the day before. The conversation was to the effect that Quinn had obtained $1,000.00 from Matya and had paid over only $400.00 of it, retaining $600.00 for himself. Ryan was represented as being a "dumb Irishman" who did not know what was going on. Ryan had some doubts about the authenticity of the tape, but it had a ring of genuineness because up to a point, at least, the conversation referred to what had actually happened; Ryan had the impression that the conversation had taken place in the VIP Lounge.

Actually, the recording was prepared in the Omaha FBI office by two agents, and the voices that Ryan heard were those of the agents. The contents of the conversation were based largely on what had been revealed by the tapes of earlier Ryan-Probst conversations. The reason for the ruse was that O'Brien at that stage did not want to use genuine tapes because Ryan would have recognized the voice of Probst. After the recording had served its purpose, it was destroyed and the Bureau made no record of its existence or use.

About this time there naturally arose the question of whether Ryan would be willing to work with the Bureau in the further development of the case, and that, of course, involved the question of what Ryan could expect to gain if he did cooperate. It is clear that the agents did not make Ryan any promise of immunity or leniency if he cooperated. All that they told him was that if he cooperated, and if he were charged, and if he were convicted, the fact of his cooperation would be made known to the sentencing judge.

Ryan agreed to cooperate. He stated that in coming to his decision he was influenced to some extent by the tape that has been mentioned, but that there were other factors that he took into consideration, in-

---

5. We do not accept O'Brien's testimony to the effect that Ryan was simply "invited" to come down to the Bureau office and that he came of his own free will. It is clear from Kelly's testimony that Ryan was stopped on a public street, was required to leave his vehicle and submit to a cursory search for weapons, was commanded to abandon his own vehicle and get into a Bureau car, and was then "read his rights" and told that he was being taken to the Bureau office. Such conduct is hardly an "invitation." It is also clear to us that if Ryan had refused to cooperate with the Bureau and had tried to leave the Bureau office he would probably have been arrested formally on the spot.

cluding the fact that he had a wife and eight children who would be left without support should he go to prison. As of this time, Ryan may or may not have suspected the true role of Probst in the case, but in any event it must have been evident to him that regardless of the genuineness of the conversation that he had heard on the tape, the Bureau indeed knew what was going on and knew that Ryan was culpably involved in it.

The cooperation of Ryan included his consensual use of a body recorder and transmitter in continuing conversations with the suspected Matya defendants and the consensual monitoring and recording of such telephone calls as he might make at the direction of the Bureau. As in the case of Probst, it seems evident that the approach that he took in later conversations with the subjects of the investigation was dictated by Special Agent O'Brien who was the "case agent" in charge of the investigation.

On September 16, 17, 18 and 19 Ryan had conversations with Quinn which were duly transmitted and recorded. Quinn finally instructed Ryan to set up an interview between Quinn and Mrs. Probst in the course of which Quinn planned to pay the juror $1,000.00. Later, it was decided that Quinn would not meet Mrs. Probst personally, but would leave the money with Ms. Beverly Rogers, a friend of his, who was employed at Gorat's Restaurant in Omaha.

On the evening of September 19 Quinn went to Gorat's Restaurant and had a conversation with Ms. Rogers, but he left no money with her, nor did they discuss the giving of any money to Mrs. Probst or to anyone else.

Later on the same evening Quinn explained to Ryan that he had information that the Bureau was becoming suspicious that efforts were being made to tamper with jurors and government witnesses, and that he had decided to postpone the exchange of money for the time being.

At this point in time, Special Agent O'Brien evidently came to the conclusion that attempts to develop the case further would not be profitable, and that Quinn, the Murphys and Matya should be taken into custody, and that was done.

It should be said that during the conversations that have been mentioned Probst and Ryan were under essentially constant surveillance by Bureau Agents, including Special Agent Kelly who was charged with the responsibility of coordinating the surveillances.

At the trial the government relied on the testimony of Ryan, who was a reluctant witness at best, the recordings of numerous personal and telephone conversations between and among the parties involved and the testimony of Special Agents O'Brien and Kelly and other agents who had participated in the investigation. The government also called Ms. Rogers to the stand to testify about her conversation with the defendant on September 19. The calling of Probst was not necessary for the government's case, and he was never called as a government witness.

The defendant took the stand in his own behalf. He testified that he had never really wanted nor intended to bribe Mrs. Probst, that he had tried to evade or avoid the importunities of Ryan and Probst, particularly the former, by putting them off, that Ryan simply had not taken "no" for an answer, and finally had gone so far as to tell him that Mrs. Probst was becoming angry at the delay, and that if she was not paid, she would vote for a conviction regardless of the evidence in the Matya case. Quinn finally conceded, however, that on the occasion that has been described he did in fact plan to turn $1,000.00 over to Beverly Rogers to be paid by her to Mrs. Probst, but that he became frightened and did not make the payment.

The defendant also relied on the testimony of Ryan, elicited on cross-examination, to the effect that Ryan had been tricked into cooperating with the Bureau, that he had been instructed by the agents to pursue and threaten Quinn with an adverse vote by Mrs. Probst if he did not pay her to vote for acquittal, and that he was coached and instructed in detail as to how to react to Quinn's efforts to abandon the scheme.

Additionally, the defendant called as a witness Dr. Wayne Sands of Des Moines, Iowa, who is a radiologist and a psychiatrist. Dr. Sands testified that he had interviewed the defendant on two occasions in November, 1975, had administered certain tests, and had had a brain scan run on the defendant at an Omaha hospital, the results of which scan he had evaluated. Dr. Sands did not testify that the defendant was psychotic or legally insane. However, the doctor did express the opinion that the defendant in 1974 was a victim of premature aging characterized by a loss of brain cells, and that he was unusually and abnormally susceptible to suggestions by other people.

The trial court instructed the jury that the burden was on the government to prove beyond a reasonable doubt that the defendant in fact attempted, directly or indirectly, to influence Mrs. Probst in the performance of her duties, that in doing so the defendant acted willfully, knowingly and corruptly, and that he acted with the specific intent to influence the juror. The trial court adequately defined such terms as "willfully," "knowingly," and "corruptly," and carefully instructed the jury with regard to intent.

As to entrapment, the district court instructed the jury in conventional terms, and told the jury that the burden was on the government to prove by the evidence and beyond a reasonable doubt that the defendant had not been entrapped. And the jury was told that if the defendant simply yielded to threats made by Ryan or Probst, purporting to speak for Mrs. Probst, that unless she was paid money she would vote to convict in the Matya case, the defendant would not have acted with the requisite intent and that he should be found not guilty.

**I**

■ While the defendant complains of the instructions of the court and of the court's refusal to grant certain of his requests for instructions, we have carefully considered the instructions as a whole and the refused requests of the defendant, and we are satisfied that the instructions stated the law fully and fairly and presented to the jury the defendant's theory of the case to the extent that the defendant was entitled to have it presented.

■ We are also satisfied that the jury was justified in finding, as it evidently did find, that the defendant was not entrapped, and that he made a voluntary, willful, knowing and corrupt attempt to approach Mrs. Probst with an offer of money, and that he did so with the specific unlawful intent to influence her vote in the Matya case.

We pass to other contentions of the defendant.

**II**

Perhaps the principal claim of the defendant is that the conduct and "creative activity" of Special Agents O'Brien and Kelly in developing the case against the Matya defendants were so outrageous as to constitute "entrapment as a matter of law."

■ The conventional concept of "unlawful entrapment" is that a criminal intent or design is deliberately implanted in the mind of an innocent person by government agents including informers and undercover agents, and that a person is not unlawfully entrapped if he has a predisposition to commit the crime, and if the agents simply give him an opportunity to commit it and work in concert with him in committing it or attempting to commit it. *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Robinson*, 539 F.2d 1181 (8th Cir. 1976). Whether a person has been entrapped in that sense of the term is ordinarily a question of fact for the jury with the burden being on the government to prove an absence of entrapment. In the instant case, as we have seen, the factual aspect of the defendant's claim of entrapment was submitted to the jury, and the jury resolved it adversely to the defendant.

Recent cases have recognized, however, that apart from any question of predisposition of a defendant to commit the offense in question, governmental participation may be so outrageous or fundamentally unfair as to deprive the defendant of due process of law or to move the courts in the exercise of their supervisory jurisdiction over the administration of criminal justice to hold that the defendant was "entrapped" as a matter of law. In that connection *see*, in addition to the cases just cited, *United States v. Reifsteck,* 535 F.2d 1030 (8th Cir. 1976); *Willis v. United States,* 530 F.2d 308 (8th Cir. 1976); and *United States v. Weber,* 518 F.2d 987 (8th Cir. 1975). A claim of entrapment on the basis of outrageous government involvement does not present any question for a jury to decide but solely a question of law for the court. Thus, the district court did not err in refusing to submit that aspect of the defendant's entrapment defense to the jury. *United States v. Reifsteck, supra,* 535 F.2d at 1034.

In seeking to detect and punish crime, law enforcement agencies frequently are required to resort to tactics which might be highly offensive in other contexts. Granting that a person is predisposed to commit an offense, we think that it may safely be said that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process or evoke the exercise by the courts of their supervisory powers so as to deny to the officers the fruits of their misconduct. *Cf. McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Anderson v. United States,* 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943); *United States v. Rose,* 541 F.2d 750 (8th Cir. 1976).

We have considered the evidence bearing on the conduct of O'Brien and other agents concerned in the case, and we are not persuaded that their conduct overstepped the bounds of permissibility.

The district court specifically found that the cooperation of Probst and Ryan with the Bureau was voluntary, although that of Ryan was certainly reluctant. The findings of the district court in this area have substantial evidentiary support and are not clearly erroneous.

Although Ryan was deceived to some extent by the fabricated tape that has been described, it should be kept in mind that what the voices said on the tape was substantially true and that Ryan knew it. Ryan also had some doubts about the genuineness of the tape, and the tape was only one factor that he took into consideration in making a voluntary choice between two evils with which choice his own conduct had confronted him. There was never any real question that the cooperation of Probst with the Bureau was voluntary; it will be remembered that Probst made the call to O'Brien that alerted the Bureau as to what was taking place.

Granting the voluntariness of the cooperation between Probst and Ryan, on the one hand, and the Bureau, on the other hand, we think that the Bureau violated no right of Quinn or the other Matya defendants when it coached Probst and Ryan as to what they should say in talking with the Matya defendants and when it told the informers what questions to ask and suggested the answers that should be given to certain questions should those questions be asked.

With respect to Quinn's claim that he wanted to withdraw from the project and that he continued his participation therein as a result of the importunities of Ryan and Probst, particularly the former, we think that Quinn's contentions went ultimately to the question of whether he acted willfully and corruptly and with intent to influence Mrs. Probst. That question was presented to the jury, and the jury answered it adversely to Quinn.

### III

The defendant contends that the admission into evidence of the "warrantless" recordings of conversations involving Ryan, Probst, the Murphys and Matya violated the fourth amendment rights of the defendant and also violated the provisions of Title

III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.*

In view of our conclusions that the district court permissibly found that Ryan and Probst, while acting as agents of the government, voluntarily consented to the recording and transmission of their conversations, we reject this contention of the defendant. *See United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *United States v. Rich,* 518 F.2d 980, 984–85 (8th Cir. 1975); and *United States v. McMillan,* 508 F.2d 101 (8th Cir. 1974).

### IV

The defendant argues that since the district court entered judgments of acquittal in favor of the Murphys and Matya at the conclusion of the government's case it should have directed a mistrial as to Quinn because the jury had been permitted to hear evidence of extrajudicial statements of the Murphys and of Matya, which were not made in the presence of Quinn, and which tended to incriminate him.

The record reflects that as the trial proceeded the district court properly admitted on a tentative basis evidence of the conversations of which the defendant now complains, and in that connection gave adequate cautionary instructions to the jury, which instructions were repeated from time to time as the occasion arose. *See United States v. Kelley,* 526 F.2d 615, 618 (8th Cir. 1975), *cert. denied,* 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976), and cases cited.

Assuming arguendo that the statements in question ceased to be admissible against Quinn when the district court ruled that the government had failed to make a submissible case against his codefendants, *cf. United States v. Kelley, supra,* and *United States v. Frol,* 518 F.2d 1134 (8th Cir. 1975), and assuming further that the jury may have given some weight to the statements, we do not consider that they were so incriminating as far as Quinn was concerned as to require the district court to

grant a mistrial at the conclusion of the government's case, or to grant the defendant's motion for a new trial, or to require us to reverse Quinn's conviction. Actually, the implication of Quinn by the Murphys and by Matya was comparatively minor; the strength of the government's case against Quinn lay in the government's proof of what Quinn said and did personally.

### V

After the defendants in the case were arrested, Ryan retained counsel of his own, Mr. J. William Gallup, and Mr. Gallup advised counsel for the government that Ryan would refuse to testify on fifth amendment grounds unless he was granted immunity. However, immunity had not been granted by December 4, 1975 when Ryan was called to the witness stand.

On that date Ryan appeared in court with his attorney. Ryan took the stand, was sworn, and answered two questions by giving his name and street address. As counsel for the government began a third question, the trial judge interjected and advised Ryan of his privilege against self-incrimination. The judge also took note of Mr. Gallup's presence in the courtroom and asked if he cared to be heard. Mr. Gallup replied that his client had been advised and knew how to handle the matter.

Counsel for the government then asked Ryan whether he knew the defendant, and Ryan immediately invoked the fifth amendment. This took place during the afternoon session of court. The trial judge and counsel on both sides repaired to chambers where the defendants all moved to dismissal of the charge or for a mistrial. There was a considerable discussion of those motions, and the jury was excused until Monday, December 8, since the court had another matter on its calendar for Friday, December 5. The court then recessed without having ruled on the motions before it.

The trial was resumed on December 8, and court and counsel again met in chambers. The defense motions were argued further and were at length overruled by the district court on the authority of *United*

States v. Puntillo, 440 F.2d 540 (7th Cir. 1971). Thereafter, additional proceedings were held in chambers including the formal "immunization" of Ryan, a hearing as to whether or not he had voluntarily agreed to cooperate with the government, an examination of Special Agent O'Brien with respect to the fabricated tape that was played to Ryan, and a hearing as to the voluntariness of Probst's cooperation with the government.

With those matters out of the way, trial before the jury was resumed, and the jury was instructed at the outset that it should give no consideration whatever to the fact that Ryan had originally declined to testify. A similar instruction was included in the district court's final charge to the jury.

The defendant contends that government counsel knew when Ryan was called to the stand that he would invoke the fifth amendment and that counsel acted in bad faith and with intent to prejudice all of the defendants by having Ryan claim his privilege in front of the jury, that Quinn was prejudiced by that action, and that the prejudice was magnified by the fact that the jury was left over night and for three full days and for a large part of a fourth day with no impression of Ryan except that he had refused to testify on the ground that his testimony would incriminate him.

■ In the course of a criminal trial before a jury, the act of a federal prosecutor in calling a witness to the stand with advance knowledge that the witness will invoke the fifth amendment may or may not call for a mistrial; each case must be decided in the light of its own facts and circumstances, and consideration must be given to the motive of the prosecutor in calling the witness and to the likelihood of the jury drawing unwarranted inferences against the defendant from the fact that the witness has declined to testify on constitutional grounds.

■ The question of whether a mistrial should be declared in a particular case is one that addresses itself in large measure to the discretion of the trial court. See Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); United States v. Scott, 511 F.2d 15, 21 (8th Cir. 1975); United States v. Willis, 482 F.2d 1034, 1039 (8th Cir. 1973); United States v. King, 461 F.2d 53, 57 (8th Cir. 1972); United ed States v. Brickey, 426 F.2d 680, 687–89 (8th Cir.), cert. denied, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970). And, to some extent, it may lie within the discretion of the trial judge whether to pass upon a claim of privilege in camera or whether to do so in the presence of the jury. United States v. Brickey, supra.

■ We agree with the district court that the episode involving Ryan's claiming his privilege did not call for a mistrial either on a theory of prosecutorial misconduct or on a theory of actual or potential prejudice. Namet v. United States, supra, 373 U.S. at 186–87, 83 S.Ct. 1151.

While we think that government counsel might have done well to have arranged to handle the matter of Ryan's privilege and the granting of immunity to him in chambers rather than to have called him to the witness stand in the presence of the jury in the first instance, there is nothing to indicate that counsel acted in bad faith or for the purpose of having Ryan claim his privilege in front of the jury.[6]

Nor does it appear to us that Quinn suffered any prejudice from the fact that Ryan claimed his privilege on December 4. Ryan returned to the stand on December 8 and testified and was cross-examined exhaustively. We do not agree with defense counsel in the importance that he attaches to the time lapse between Ryan's claiming privilege on December 4 and then commencing his real testimony in chief on December 8.

## VI

Mention has been made of the fact that Probst and Special Agent O'Brien had been

---

**6.** It is clear that counsel at all times intended to have immunity granted to Ryan, and the full testimony of Ryan was indispensable to the government's case.

acquainted for a number of years and that some of their dealings had been of an official nature. Counsel for the Matya defendants, including Quinn, desired to develop in the course of the cross-examination of O'Brien and of the examination of Probst when he was called as a defense witness, that in former years Probst had served as an informer for the Bureau or had had some other close relationship to that organization. Such a fact might have had some bearing on the credibility of Probst or upon the claim of Quinn that the Bureau Agents had been guilty of outrageous conduct.

The district court held an in camera hearing in the course of the cross-examination of O'Brien from which hearing defendants and their attorneys were excluded. In the course of the hearing O'Brien was questioned by government counsel and by the trial judge and testified at some length as to the nature of his dealings with Probst. That testimony was transcribed by the court reporter, and the transcript was sealed by the trial judge and was transmitted to this court under seal.

The district court concluded that the prior relations between Probst and the Bureau were completely irrelevant to the instant case and did not involve any of the defendants or any of the defendants in the Matya case or any of the attorneys in either case, and defense counsel were so advised. Thereafter, defense counsel, including counsel for Quinn, were permitted to cross-examine O'Brien fully with respect to the participation of Probst in this case, and counsel for Quinn was also permitted to examine Probst in detail as to his activities in this case. Counsel were also permitted to show that Probst and O'Brien were acquainted and had had official dealings with each other. However, the district court consistently refused to permit counsel to inquire into the nature and extent of the prior dealings between Probst and the Bureau.

■ Ordinarily where the government uses an informer as a witness in a criminal case, or has paid a witness for past services, or has promised a witness immunity or le-

niency in exchange for his testimony, a defendant is entitled to develop those facts within reasonable limits by means of cross-examination or otherwise. And, in instances, a defendant is entitled to advance information as to facts which might seriously detract from the credibility of a government witness. *See, e. g., Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Sanders v. United States,* 541 F.2d 190 (8th Cir. 1976); *Weiland v. Parratt,* 530 F.2d 1284 (8th Cir. 1976); *United States v. Librach,* 520 F.2d 550 (8th Cir. 1975); *Harris v. United States,* 371 F.2d 365 (9th Cir. 1967).

■ In *Harris v. United States, supra,* a case upon which Quinn places considerable reliance, the court recognized that where the credibility of a government witness is involved, defense counsel should be permitted a wide latitude in cross-examination. But the court also said that a trial judge not only has a right but also a duty to exercise "such control over the scope of the examination as is necessary to prevent the parties from unduly burdening the record with cumulative or irrelevant matter." 371 F.2d at 366. In the last analysis, the scope of the examination and cross-examination of a witness must be determined by the trial court in the exercise of its discretion. *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *United States v. Chrisco,* 493 F.2d 232 (8th Cir.), *cert. denied,* 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 77 (1974); *United States v. Vaughn,* 486 F.2d 1318 (8th Cir. 1973); *United States v. Cochran,* 475 F.2d 1080 (8th Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *United States v. Turchick,* 451 F.2d 333 (8th Cir. 1971); *United States v. Brickey, supra.*

■ We have given careful consideration to the contention of the defendant that is now being discussed, and we conclude that defense counsel was not unduly restricted in his efforts to develop the history of the prior dealings between Probst and the Bureau. What, if anything, Probst may have done for the Bureau in years prior to

1974 had nothing to do with whether Quinn had attempted to bribe Mrs. Probst or with what Probst did in assisting the Bureau in developing this case. We have already found that the government was not guilty of any outrageous conduct in its own dealings with Probst, and as a matter of fact his testimony did not present any real question of credibility, at least within the context of this case.

We have reached this conclusion without regard to what was developed in the course of the in camera hearing at which O'Brien testified with respect to his dealings with Probst in prior years, and we seriously question the propriety of that hearing in view of the guarantees of the sixth amendment to the Constitution of the United States. However, in this particular case we are satisfied that if the district court committed constitutional error when it conducted the hearing, the error was harmless beyond reasonable doubt.

Finding no reversible error, we affirm the judgment of the district court.