STATE of South Dakota, Plaintiff
and Appellee,

v.

Kyle Chris MOELLER, Defendant
and Appellant.

No. 15072.

Supreme Court of South Dakota.

Considered on Briefs, Feb. 13, 1986.

Decided June 4, 1986.

Rehearing Granted July 10, 1986.

Clair B. Ledbetter, Asst.Atty.Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty.Gen., Pierre, on brief.

J.M. Grossenburg of Day, Grossenburg & Whiting, Winner, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY

On June 27, 1985, a Tripp County jury returned two verdicts which found appellant-defendant Kyle Chris Moeller (Moeller), guilty of Distribution of a Controlled Substance, to wit: Cocaine, a violation of SDCL 22-42-2 and SDCL ch. 34-20B; and guilty of Possession of a Controlled Substance, to wit: Cocaine, a violation of SDCL 22-42-5 and SDCL ch. 34-20B. The trial court, by an Order Suspending Imposition of Sentence, did not enter a judgment of conviction on the above offenses. Instead, as the title of the order denotes, the trial court suspended the imposition of Moeller's sentence, placed him on five years' probation, imposed a $1,000 fine, and ordered Moeller to serve 30 days in the South Dakota State Penitentiary. Moeller contends he was entrapped. We affirm.

## FACTS

In April 1984, South Dakota DCI Special Agent Dennis Boots (Boots), a/k/a Dennis Baker, began an undercover investigation of illegal drug distribution in Tripp County and the surrounding area. Upon his arrival, local law enforcement officials showed Boots a picture of Moeller. Law enforcement intelligence reports indicated that

Moeller was involved with drugs. Moeller, who at the time of trial was 27 years old, worked on his parents' farm and lived in a mobile home thereon approximately 25 miles northwest of Winner, South Dakota.

In the following months of 1984, Boots observed Moeller in the local bars. In July 1984, Boots tried to buy Moeller a drink in a local tavern, but Moeller declined. After this, and until March 1985, Boots did not investigate Moeller to any great extent. Boots, however, did observe Moeller smoking marijuana on two occasions, but Boots had no interaction with Moeller until March 1985.[1]

In March 1985, Boots learned that Moeller was interested in selling a sports car. Thereafter, Boots phoned Moeller's parents several times and expressed an interest in purchasing the car. Moeller, through another individual, then contacted Boots about the car sale. On March 14, 1985, Boots and a local individual who was cooperating in the investigation, went to Moeller's residence under the pretense of purchasing Moeller's car. Since the car was not there, the three talked and smoked some of Moeller's marijuana. Boots twice asked Moeller to sell him some marijuana. Moeller refused stating that he did not deal in drugs. Thereafter, Moeller did give Boots two marijuana joints for the road.

Moeller met Boots at a Winner bar the next day, March 15, 1985 and Boots gave Moeller $100 to hold the sports car. Purchase price of the car was agreed at $2,200 but its wholesale market value in Denver was only $700 to $800. Moeller set the price for the car. At this time, Boots suggested a trade of 24 pounds of Columbian

marijuana for 12 pounds of Sensamelion marijuana. Sensamelion marijuana is a hybrid of more value in illegal drug markets. Boots previously made it known that he was from California and that Sensamelion was not as readily available in California as was Columbian marijuana. Moeller responded that he did not deal but that he might know some interested individuals.

Boots thereafter left the Winner area for two weeks under the pretense of going to California. Upon his return to Winner, and on one of the first two days of April 1985, Boots again met with Moeller at the latter's residence. At this time, the car sale was discussed. Boots then stated that his father owned a construction company in California and his father's company needed workers. Boots further stated he had previously made $9,000 a month working for his father's construction company and that Moeller could make $5,000 a month. Employing a calendar, Boots and Moeller planned when they could leave for California and when they could return to Winner for a scheduled event and pick up Moeller's cousin Tim. On this same date, Boots again suggested the marijuana trade. Moeller thereupon inquired as to how many pounds of Columbian marijuana he could get in trade for his sports car.

In the following days, Moeller informed his parents of the $5,000-a-month California construction job and arranged for his cousin Kathy to take over some of his farm duties. Moeller also contacted an individual in Pierre concerning the marijuana trade.

April 7, 1985, was the date set for the marijuana trade. On this day, at 2:45 p.m., Boots told Moeller that Moeller and the

1. The dissent paints a scenario of Agent Boots pursuing Moeller for drug sales and Moeller refusing "for fully a whole year." This scenario, however, is not supported by the written record herein. The record indicates, as previously stated, that Boots had no interaction with Moeller until March 1985. Boots testified that he never tried to get to know Moeller during that year, and never tried other times to get to know Moeller, because Winner is "a small community and in order to get to know people you don't just walk up and ask them for drugs." Moeller's own trial testimony indicates that Moeller did not remember Boots' offer to buy a drink and did not remember even seeing Boots until March 1985. Thus, the record reveals that it took Boots a year to meet Moeller and that Moeller was unaware of Boots' presence in Winner until March 1985. Of the six or seven times, per Agent Boots' testimony, that Boots had contact with Moeller, one contact was in July 1984 when Boots attempted to buy Moeller a drink, and the other six contacts were in March and April 1985. This does not support the dissent's contention that Boots hounded Moeller for an entire year.

person trading marijuana should possess some drugs so that he, Boots, would be sure they were not undercover narcotics officers. Moeller stated that he could obtain cocaine from an individual in Winner and various quantities of cocaine were further discussed. As testified to at trial, however, the sole reason Boots wanted Moeller to get drugs was so he could arrest Moeller for having drugs. Later that afternoon, Moeller phoned Boots and stated that everything was fine on his end.

That evening, the parties met in a Winner bar and then proceeded to the Winner airport. There, Moeller and the individual from Pierre removed from their persons small packets containing cocaine and handed them to Boots. Boots asked the price and then handed money to the person from Pierre. Moeller received the cocaine he possessed from the individual from Pierre and possessed it as Boots had requested so that Boots would believe he, Moeller, was not an undercover narcotics officer.

Within minutes, the parties were arrested. During Moeller's booking at the Winner Police Station, a cocaine spoon necklace and a cocaine sifter were taken from Moeller. Although in Moeller's possession, the cocaine sifter was the property of the individual from Pierre.

After a jury trial, Moeller was convicted of possession and distribution of cocaine. At all appropriate times, defense counsel moved for the dismissal of the charges because entrapment, as a matter of law, existed. This the trial court refused to do. Instead, the entrapment issue was left for the jury's resolution and they were instructed thereon.

## DECISION

### I.

DOES THE EVIDENCE REVEAL ENTRAPMENT AS A MATTER OF LAW? WE HOLD THAT IT DOES NOT.

Entrapment is the "inducement of one to commit a crime not contemplated by him for the mere purpose of instituting criminal proceedings against him." *State v. Williams*, 84 S.D. 547, 551, 173 N.W.2d 889, 891 (1970). When determining whether entrapment exists, this Court uses the subjective test first espoused in *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). Under this test, also known as the origin of intent test, *State v. Nelsen*, 89 S.D. 1, 7, 228 N.W.2d 143, 147 (1975), the focus is on where the intent to commit the crime originated, i.e., whether in the defendant or in the government agent. *State v. Johnson*, 268 N.W.2d 613, 614 (S.D.1978). Thus,

it is the jury's duty to decide whether the defendant was predisposed to commit the crime. In other words, does the evidence show that the criminal intent is traceable to the defendant or to the Government Agent? Where the genesis of the intent to commit the criminal act is in the mind of the Government Agent "and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act" entrapment is established. If, however, the defendant was predisposed to commit the crime when encouraged to do so by an agent, the defense will fail because there is no entrapment when agents merely offer the defendant an opportunity to commit the offense. Thus, to decide this issue the subjective intent of the defendant should be focused on by the jury, to-wit, was he intent on performing the criminal act with the police only furnishing him an opportunity, or was he an innocent person lured into committing a crime.

*State v. Nelsen*, 89 S.D. at 7–8, 228 N.W.2d at 147 (citations omitted). When conflicting evidence exists as to the origin of the intent to commit the crime charged, the question of entrapment is for the jury, *Williams*, 84 S.D. at 553, 173 N.W.2d at 892, and when there is substantial evidence from which the jury may infer that the criminal intent originated in the defendant's mind, entrapment as a matter of law is not established. *Id.*

"There are two components to the entrapment defense; the defendant must

show police inducement to commit the crime and that he was not predisposed to commit the specific criminal act." *State v. Iverson*, 364 N.W.2d 518, 528 (S.D.1985). The four principal inducements which may locate the intent in the State are appeals to friendship, sympathy, offers of excessive amounts of money, and appeals to a narcotic's needs. *State v. Nagel*, 279 N.W.2d 911, 916 (S.D.1979). "In addition to showing such inducements, the defendant must also show that 'undue, prolonged or persistent pressures were exerted against him, ... that this inducement was dangled in front of him'[,] ... or that he was 'played upon' ...." *Nelsen*, 89 S.D. at 10–11, 228 N.W.2d at 148 (citations omitted). In determining whether a defendant was predisposed to commit the specific criminal act, the facts surrounding the transaction are relevant as are several definite criteria such as whether the defendant first suggested the crime; the defendant's readiness to commit the crime; the defendant's familiarity with the criminal activity; the defendant's possession of a large supply of illegal contraband before the alleged entrapment; the defendant's ready access to the contraband; and the defendant's ability to collect a large quantity of contraband in a short time. *Id.*, 89 S.D. at 10, 228 N.W.2d at 148.

In the present case, as concerns the inducement component of the entrapment defense, the facts do reveal that an offer of employment at an exceptional wage was dangled in front of Moeller and Moeller testified that but for this employment offer, he would not have procured the cocaine requested by Boots. Thus, *presumably*, the first component was established.[2]

As for the second component, the absence of a predisposition to commit the specific criminal act, Moeller does not fair so well. Facts reveal that although Boots suggested the marijuana trade and the possession of drugs to prove the parties were not undercover narcotics officers, Moeller stated that he could get cocaine and could get it locally. Moeller readily responded to Boots' request and Moeller expressed no reservations about procuring or possessing cocaine. Moeller discussed various quantities that could be procured and when arrested, he possessed a cocaine spoon and a cocaine sifter. In a matter of hours, Moeller procured the cocaine, Moeller's and Boots' conversations revolved around illegal drug use, and Moeller had previously distributed marijuana to Boots. Although Moeller stated that he never sold drugs or used cocaine, the offenses for which he was arrested, to wit, possession and distribution of a controlled substance, do not require that he consume, use, or sell such a substance but only require that he possess and deliver/transfer it and this is what Moeller did.

■ Viewing the evidence in the light most favorable to the State, *Johnson*, 268 N.W.2d at 616, we hold that conflicting evidence exists as to Moeller's predisposition to commit the crimes.[3] Therefore, the

2. The dissent states that it is obvious that appeals to friendship, appeals to sympathy, and offers of excessive amounts of money are easily attributable to the government. Although we presume the $5,000-a-month California job was an offer of excessive amounts of money, Moeller admitted at trial that Boots never offered him any large amount of money for the cocaine and that the car sale and the California job were not contingent on the drug deals. As for appeals to friendship and sympathy, the written record does not reveal such. Boots testified that he did not know Moeller that well, and Moeller testified that he did not care for Boots and that Boots was not a very good friend. Additionally, Moeller testified that Boots did not plead with him as a friend, did not make him feel sorry for Boots, and that he did not deliver cocaine out of sympathy.

3. The dissent states: "There is nothing in the testimonial record to demonstrate that Moeller had a detailed knowledge of the logistics of drug transactions, an understanding of techniques in trafficking of cocaine, nor of any predisposition to sell or possess cocaine." The written record, however, among other things, reveals that Moeller was familiar with drug culture language and talked often about marijuana and drugs. Moeller gave—distributed—marijuana to Boots, Moeller inquired about trading his car for five pounds of marijuana, and Moeller arranged the marijuana trade. Moeller accepted the idea of possessing drugs, Moeller brought up obtaining

trial court correctly refused to rule entrapment existed as a matter of law. *After Boots suggested the crimes, it was Moeller's activities that brought it to fruition.* Moeller was ready to commit the crimes, he was familiar with the criminal activity, he had ready local access to the drug, and he collected it within a few hours. Under these circumstances, the disposition and ability to commit the crimes were not implanted in an unwary innocent nor staged for his performance. Entrapment, as a matter of law, was not established and the trial court properly submitted the issue to the jury. Based on the facts and the entrapment instruction, the jury found there was no entrapment.

## II.

WAS BOOTS' INVESTIGATORY CONDUCT SO OUTRAGEOUS AS TO BAR PROSECUTION OF MOELLER UNDER DUE PROCESS CONSIDERATIONS? WE HOLD IT WAS NOT.

In *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 373 (1973), the United States Supreme Court stated: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed." (Citation omitted.)

Based on this language and the facts of the present case, Moeller contends Boots' conduct in instigating the crimes was so outrageous as to bar his prosecution under due process considerations.

The above-quoted language has been labeled as dicta, *see United States v. Dion,* 762 F.2d 674, 685 (8th Cir.1985), *cert.*

*granted,* —— U.S. ——, 106 S.Ct. 270, 88 L.Ed.2d 225 (1985); and *United States v. Prairie,* 572 F.2d 1316, 1318 (9th Cir.1978). Other cases, however, have held or intimated that outrageous police conduct, in an entrapment setting, will bar prosecution because of due process violations. *See* special writings in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (Powell and Blackmun, Justices, concurring in judgment; Brennan, Stewart, and Marshall, Justices, dissenting); *United States v. Twigg,* 588 F.2d 373 (3rd Cir. 1978); *United States v. Johnson,* 565 F.2d 179 (1st Cir.1977), *cert. denied,* 434 U.S. 1075, 98 S.Ct. 1264, 55 L.Ed.2d 780 (1978); *United States v. Quinn,* 543 F.2d 640 (8th Cir.1976); and *United States v. Archer,* 486 F.2d 670 (2nd Cir.1973).

■ In the case at bar, however, we do not have police instigating violent crimes against third persons for the purpose of gathering evidence. We do not have police instigating crimes by gratuitously supplying the criminal tools or devices. We do not have police instigating crimes by supplying the defendant with contraband to be sold to other police agents. We do not have police instigating crimes by gratuitously supplying the wares and indispensable ingredients when the defendants do not have the means or money to obtain them on their own. We do not have police instigating crimes by furnishing the facilities for criminal operations. We do not have police instigating crimes by completely controlling the criminal enterprise and providing the expertise when the defendants do not have the know-how and can provide only minimal assistance. And we do not have police instigating crimes through police violation of the law or through police violation of a defendant's, or

cocaine, and Moeller procured cocaine within a matter of hours. An individual from Pierre had a list of people, which list was admitted into evidence. This list noted individuals with whom she was hoping she could get to sell drugs for her. Moeller's name was on it with $720 of hopeful drug sales projected. Finally, the record reveals that Boots and Moeller discussed California cocaine, that Moeller said he

would fit right in with Boots' California friends who were involved in drugs, and that Moeller said he thought he knew a California drug dealer; further, that maybe Boots and he could get rid of some drugs through the California drug dealer. This evidence diminishes the thrust of advocacy that Moeller had no knowledge or understanding of drug deals and that he was not predisposed to distribute or possess cocaine.

the public's, constitutional or statutory rights. Thus, under these circumstances, although we cannot condone Boots' final tactics for procuring Moeller's arrest, we cannot hold the undercover activities here in question to be so outrageous so as to bar prosecution because of due process violations.

Affirmed.

FOSHEIM, C.J., and MORGAN, J., concur.

WUEST, J., and HERTZ, Circuit Judge, Acting as Supreme Court Justice, dissent.

SABERS, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.

HERTZ, Acting Justice (dissenting).

I dissent. I would find that entrapment was established as a matter of law.

It is important to note at the very outset that the facts in this case are not in dispute. It is the application of those facts to the law that poses the real problem.

The majority opinion admits that the idea to obtain cocaine clearly originated with the State and its agents. With this I wholeheartedly agree. The majority, however, concludes that the defendant had a predisposition to commit the crime, and that this was a question for the jury. On the basis of the evidence as detailed in the trial record, I cannot agree with this conclusion.

To successfully establish entrapment, as pointed out by the majority, two elements are required:

1. The defendant must show police inducement to commit the crime; and

2. That prior to this inducement he was not predisposed to commit the criminal act.

We have declared that four principal inducements may locate the intent in the government rather than the accused:

1. Appeals to friendship,

2. Appeals to sympathy,

3. Offers of excessive amounts of money, and

4. Appeals to the narcotics need, (not applicable here).

Without recounting the evidence, it is obvious that all of the first three inducements are easily attributable to the government.

Further, we have listed the criteria to be considered in determining whether the defendant had a preexisting intent:

1. Did the defendant first suggest the crime?

   —The record is completely devoid of this element.

2. How ready was the defendant to commit the crime?

   —For up to a whole year, the defendant refused all of the Agent's solicitations to sell marijuana or cocaine. This despite the fact defendant was already a user of marijuana.

3. Ready response to police inducement?

   —Not very ready, in light of Agent's endeavor to obtain a response which continued almost a full year.

4. How familiar was defendant with the criminal activity?

   —Defendant was familiar with different types of marijuana, but there is no evidence that he was knowledgeable with the drug cocaine, albeit, he did wear a coke spoon as a necklace, but this evidence alone is not sufficient to show predisposition to *distribute* cocaine.

5. Was the defendant in possession of a large supply of illegal contraband?

   —The evidence does not warrant such a conclusion.

6. Did the defendant have ready access to cocaine?

   —No evidence to indicate this. Defendant did call Cari Dilley in Pierre, who did deal in cocaine, and she did have some.

7. Was defendant able to collect a large quantity of cocaine in a short time?

—There was only a small amount of cocaine involved in the transaction and it didn't belong to defendant.

The majority indicates Agent Boots, other than observing Moeller at local bars, had contact only once in July, 1984, when he tried to buy Moeller a drink, and then no further contact until March of 1985. Agent testified:

Q. About how many times did you have personal contact with Moeller prior to April 7th where you have actually talked to him?

A. I'd say about 6, perhaps 7 times, sir.

Agent further testified he talked personally with Moeller three times. Frank and Esther Moeller testified Agent Boots called and talked to them "many" times. (Moeller did not have a phone of his own).

Agent further testified that Moeller told him he did not have or use any cocaine. Agent Boots testified:

Q. Who made the first offer of the deal to deliver cocaine to you from Kyle?

A. I believe I informed Mr. Moeller that the reason I wanted to obtain some drugs was to make sure he wasn't a narcotics officer. So, I guess it would be me, sir.

Moeller admitted he knew someone who might be able to get Agent some cocaine. Agent admitted Cari Dilley, a lady from Pierre, furnished the cocaine and set the price at $240.00 per ounce, which Agent paid to Cari Dilley—Moeller never receiving any money whatsoever from this transaction.

Agent Boots further testified:

Q. You arrested Kyle in what month of what year, or were involved in that arrest?

A. 4–7–85.

Q. Exactly a year later, after you arrived in town?

A. Pretty close, yes, sir.

Q. During that one year period of time you were acting as an undercover officer in Winner?

A. Yes.

Q. You were trying to undercover people selling narcotics?

A. That is correct, sir.

Q. And during that one year you never did undercover Kyle Moeller selling narcotics, did you?

A. No, sir.

Agent admitted talking to Moeller and his parents about buying the car between March 1 and March 14, 1985. Further, that when he first came to Winner almost a year before, Deputy Wilcox showed him a picture of Moeller as being a person suspected of dealing in drugs.

Agent Boots further testified that on March 14, 1985, he was interested in buying Moeller's car. At this same time he asked Moeller twice to sell him some marijuana and Moeller refused, stating he doesn't deal in drugs.

The very next day, March 15, 1985, Agent agreed to buy Moeller's car for $2,200.00 and made a $100.00 down payment. On this very same day he not only promised Moeller a job for $5,000.00 a month, but also his cousin Tim Moeller, and advised that they would leave for California on May 12th. Agent admitted he "pursued" Moeller to sell him drugs or introduce him to somebody that did sell drugs.

On the very day just before the "bust" (April 7, 1985), Agent admits he reminded Moeller that the $5,000.00 per month job in California was still on.

Concerning friendship with Moeller, Agent testified:

Q. He was always friendly and gentlemanly to you?

A. Yes.

Agent further admitted that he had asked Moeller to sell, distribute or give controlled substances to him "as a friend."

Moeller's testimony clearly indicates he was extremely interested in pleasing Agent in order to keep the job offer open. He testified?

Q. Bust came down on the 7th?

A. Yeah. He asked me previously to try and line somebody up, but I

wasn't going to do it until I had that job offer. I figured that I'd get in good with him and chances are he wouldn't fire me or nothing.

Q. You were going to do him a favor because you were getting something and going to sell that car?

A. Yeah.

Q. You intended to go to California, intended to sell your car?

A. Yeah, I just wanted that five thousand dollar job.

Q. You didn't deliver that cocaine to him out of any sympathy for him, did you?

A. Just as a friend.

It is further worthy of note that sometime in the "summertime" of 1984, witness Beth Bachman said she knew Deputy Wilcox and testified concerning a conversation she overheard him have with another individual. She testified:

A. I heard him mention Kyle Moeller's name. I'm a good friend of Kyle's and I have known him for awhile and so I listened closer and he just said that he had thought that his wife, or Kyle had tried to take out his wife because they were at the same party and if he ever found out that he'd get him.

It is well to remember the statement in *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932):

The defense of entrapment is available, not in the view that the accused though guilty may go free, but that the government cannot be permitted to contend that he is guilty of a crime where the government officials are the instigators of his conduct.

Viewing the evidence in the light most favorable to the State, there appears to be a lack of evidence that Moeller was "predisposed" to possess and sell cocaine, but on the contrary, there is abundant and significant evidence that he was not "predisposed."

The government played on the weakness of Moeller and beguiled him into committing crimes which he had persistently refused to commit for fully a whole year. The evidence suggests that Moeller was not ready and willing to possess and sell cocaine whenever a "propitious opportunity" arose. The testimony is undisputed that during the course of almost a whole year, Moeller had never made any offer to sell marijuana or cocaine to the Agent, even though they had seen each other or had been with each other on numerous occasions during that time. The "propitious opportunity" was certainly there, but never acted upon by Moeller until after he had been offered large sums of money for his automobile and for employment in the state of California.

Inducement to commit an offense means affirmative activity on the part of the government agent. Whereas conduct merely affording a person an opportunity to commit an offense does not constitute entrapment. The officer's conduct should not be calculated to "create" a criminal, but rather to "catch" a criminal in the act. Here, by the Agent's own admission, he "created" the criminal. There is nothing in the testimonial record to demonstrate that Moeller had a detailed knowledge of the logistics of drug transactions, an understanding of techniques in trafficking of cocaine, nor of any predisposition to sell or possess cocaine. Further, there was no evidence showing any prior dispositions to possess or sell cocaine. At most, the record shows that Moeller was a user only of marijuana. The Agent was well aware that Moeller was a user of marijuana, but never did make an arrest for unlawful possession. Instead, the Agent vigorously pursued Moeller over an extended period of time in order to substantiate the more serious charge of distribution. Moeller successfully resisted the badgering or importuning activity on the part of the Agent, until the Agent no doubt in exasperation changed tactics and offered excessive and unrealistic amounts of money. This simply is not a case where Moeller initiated the sale. The initiative from beginning to end came from the State's Agent. *See* for ex-

ample *State v. Kamrud,* 188 Mont. 100, 611 P.2d 188 (1980), and *State v. Grenfell,* 172 Mont. 345, 564 P.2d 171 (1977), where the Montana Supreme Court found entrapment as a matter of law on facts much less favorable to the defendant than exists in the present case. *See also:* Annot., 62 A.L.R.3rd 145 (1975).

In *State v. Williams,* 84 S.D. 547, 553, 173 N.W.2d 889, 892 (1970), we said:

> Entrapment as a matter of law is not established where there is *substantial evidence* from which it may be inferred that the criminal intent to commit the offense originated in the mind of the accused. (emphasis added.)

The opposite then also must be true. Where the evidence is insubstantial then entrapment is established as a matter of law.

In *United States v. Dion,* 762 F.2d 674 (8th Cir.1985), there is a comprehensive and detailed discussion of the development of the defense of entrapment. The *Dion* court, citing Judge Sanborn in the case of *Butts v. United States,* 273 F. 35 (8th Cir.1921), stated:

> The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. * * * It is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded and lured him to attempt to commit it.

Further, *Dion* quoted with approval from *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) that:

> The conduct with which the defense of entrapment is concerned is the manufacturing of crime by law enforcement officials and their agents. Such conduct, of course, is far different from the permissible strategems involved in the detection and prevention of crime.

The crimes with which Moeller was charged and convicted were totally "manufactured" by the State's Agent. The Agent, himself, testified that the sole reason he wanted Moeller to get drugs was so he could arrest Moeller for having drugs. The Agent had targeted Moeller in April of 1984. It took until April of 1985 to persuade Moeller to obtain cocaine. This at Agent's insistence so Moeller could prove to Agent that he, Moeller, was not a narcotics agent. The record clearly shows the Agent set in motion his own scheme to bait an otherwise unpredisposed and unsuspecting Moeller into having cocaine in his possession at a certain time and place so that Agent could arrest him. After Agent had favored Moeller with $2,200.00 for an automobile admittedly worth only $800.00, and offered him a nonexisting job in California at $5,000.00 per month, Agent again requested Moeller to sell him some drugs. Again Moeller refused to do so. Unsatisfied, Agent finally persuaded Moeller to arrange for a third person to deal in drugs with Agent, with the proviso that Moeller must possess some of these drugs at that time to prove he was not a narcotics agent. As defense counsel aptly stated: "The question of whether or not Kyle Moeller was selling drugs was replaced with the question of: Is Kyle Moeller capable of being enticed to possess drugs?"

The majority opinion placed great emphasis on the statement: "After Boots (Agent) suggested the crime, it was Moeller's activities that brought it to fruition." Is this not true in every case involving the defense of entrapment, whether it be a jury question or a law question for the court? The majority misses the point. Every person who bites on the bait in an entrapment case can be said to be "predisposed" by his subsequent activity in response to government inducement. However, a defendant's predisposition should not be assessed as of the time when he committed the crime as the majority indicates, but rather predisposition in entrapment cases refers to the state of mind of a defendant *before* government agents make any suggestion that he

should commit the crime. *United States v. Williams,* 705 F.2d 603, 618 (2nd Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

This is what the second part of the subjective test is all about. The required showing by defendant is "that *prior* to the inducement he (defendant) was not predisposed to commit the criminal act."

The Agent went far beyond providing an ordinary sale opportunity in an effort to ensnare Moeller. The Agent admitted he supplied the idea and plans for the crime. In other words, the Agent created the crime rather than uncovering it.

There is, of course, no fixed formula in arriving at a decision as to whether the entrapment defense is one for jury consideration, or one of law for the court. Every case must be judged on its own peculiar facts. Ultimately, it comes down to a test of fairness. Where the trickery, persuasion, and deceit of the officer rules out any perception of the fairness concept, and it is clear that such conduct implanted the criminal design in the mind of the defendant, then the court should act and bar the conviction.

It is important to remember that the presumption of innocence and the reasonable doubt standard of proof are more than platitudes to be given only lip service. In my opinion, if the rule as to presumption of innocence is fairly and properly applied in this case, reasonable minds acting fairly on the evidence would necessarily have a reasonable doubt as to Moeller's guilt.

Accordingly, I would hold that entrapment has been established as a matter of law and the conviction should be reversed. This includes the conviction for possession of cocaine, since the State's Agent was guilty of unconscionable conduct by entrapping Moeller into acting as a conduit for the sale of cocaine. This being so, the jury could not find him guilty of possession of cocaine, which he possessed only momentarily as an integral part of the sale.

I am hereby authorized to state that Justice WUEST joins in this dissent.