**UNITED STATES of America, Appellee,**

v.

**Eugene Vivian VICTOR, Jr.,
Defendant, Appellant.**

**No. 90–1673.**

United States Court of Appeals,
First Circuit.

Heard May 6, 1991.

Decided Aug. 26, 1992.

Willie J. Davis, with whom Davis & Robinson, Boston, Mass., was on brief, for defendant, appellant.

Carole S. Schwartz, Sp. Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

TORRUELLA, Circuit Judge.

Willie Scott had been a numbers writer and a lookout at a bookie joint in Roxbury, Massachusetts, during the years of 1987 and 1988. On February 2, 1989, he was subpoenaed for the first time to testify before a federal grand jury investigating illegal numbers gambling in the city of Boston. During his various grand jury appearances, which were common knowledge throughout his neighborhood, Scott testified about his involvement with the bookie joint on Woodrow Avenue and about payments he had made to a police officer. His final grand jury appearance regarding the bookie operation took place on January 24, 1990.

This case, however, is not about Scott's illegal activities, but about the threats made to him regarding his knowledge of illegal activities by appellant Eugene Vivian Victor, Jr.[1] Victor was charged in a

---

1. On July 9, 1991, following oral argument before this court, the district court judge entered

two-count indictment with tampering with a federal witness in violation of 18 U.S.C. § 1512(b) and with retaliating against a federal witness in violation of 18 U.S.C. § 1513. After a six-day jury trial, he was acquitted on the retaliation count but convicted on the tampering count. Victor appeals his conviction, claiming that the evidence was insufficient to support it and that the assertion by a witness of his Fifth Amendment rights before the jury constituted reversible error. Finding these arguments uniformly lacking in merit, we affirm.

The events on which appellant's conviction rested took place on January 29, 1990. Early that evening, Scott was in the bedroom of his third-floor apartment at 2 Savin Street watching television. He was accompanied by a female friend, Stephanie Wright, who was in the kitchen preparing dinner. At approximately 6:00 p.m. the doorbell rang and Ms. Wright answered, letting two young males whom she recognized as residents of Savin Street enter the apartment. The shorter of the two individuals was the appellant, Eugene Victor, Jr., and the taller one was a man by the name of Thomas Washington, Jr. Ms. Wright informed Scott of their presence and stayed in Scott's bedroom while Scott conversed with the two individuals in the hallway by the front door inside the apartment.

Appellant, who confessed at trial to a somewhat serious involvement in drug-related activities, instructed his cohort to check the rooms of the apartment. Washington complied and told Victor that the doors were locked. Scott then asked the appellant what was going on, to which Victor answered: "Shut up. You talk too much in the federal court, anyhow. This isn't no bookie joint on Woodrow Avenue. Just shut up." Victor then pushed open the door of the room where Stephanie Wright was watching television and, notic-

ing a second television set on the floor, asked: "[Is that a] T.V. that you can look outside or look inside with?" Minutes later, Victor and Washington both left the apartment, warning Scott as they walked down the steps that they would "be back tomorrow." A gun shot was next heard in the hallway, and Victor then hollered to Scott the following piece of advice: "[T]his is a five shot and the next one is for you and I'll be back tomorrow at two o'clock." As the two visitors departed, Scott, looking out his apartment window, saw Victor place the nickel-plated handle of a pistol back in his pocket.

Appellant testified at trial in his own defense. He admitted to having made the charged threats to Scott, yet claimed that the threats related to their drug dealings, not to Scott's testimony before the federal grand jury. Victor further admitted that after he was arrested, he called Stephanie Wright and asked her to lie to the federal authorities by telling them that she had misidentified him. Stephanie Wright, on the other hand, testified that Scott's explanation to her of Victor's visit was that he owed Victor some money which Victor wanted paid by the next day.

On appeal, we review a challenge to the sufficiency of the evidence under a familiar standard. The evidence must be viewed "in the light most favorable to the government, drawing all legitimate inferences and resolving all credibility determinations in favor of the verdict." *United States v. MacDonald & Watson Oil Co.*, 933 F.2d 35, 40 (1st Cir.1991); *United States v. Angiulo*, 897 F.2d 1169, 1197 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). Thus probed, the verdict must be upheld if any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *United States v. Mena*, 933 F.2d 19, 29 (1st

an order informing this court that he was reconsidering the finding of guilty in this case in light of a motion for a new trial filed by appellant. By order entered on August 8, 1991, this court remanded the case to the district court for further action while retaining appellate jurisdiction. Thereafter, the district court entered a memorandum and order dated March 4, 1992,

advising this court that appellant Victor had withdrawn his motion for a new trial and consequently, "the premise upon which this case was remanded ... by the Court of Appeals is no longer applicable." On June 29, 1992, appellant informed this court that he wanted to pursue his appeal.

Cir.1991). To prove a § 1512(b) violation the government had to establish beyond a reasonable doubt that Eugene V. Victor used intimidation, physical force or threats with the intent to influence, delay or prevent Willie Scott from testifying at, or to cause Willie Scott to withhold testimony from, an official proceeding. 18 U.S.C. § 1512(b). (Both a federal trial and a grand jury proceeding are "official proceedings" within the meaning of the statute. See 18 U.S.C. § 1515(a)(1)(A)). Examining the record from this perspective, we must conclude that the evidence amply supported the conviction.

■ There was abundant proof from which the jury could have determined that Victor was aware of Willie Scott's cooperation with the federal authorities. Appellant conceded as much at oral argument, and his statements during the January 29 incident confirm it. More importantly, we believe the jury could reasonably have interpreted the events of January 29, 1990, to have constituted an attempt by Victor to prevent Scott from testifying about Victor's illegal activities before the grand jury through the use of intimidation or threats. Appellant's unannounced visit, accompanied by another individual who responded to his commands, and coupled with their intrusive search of the apartment, certainly possessed sufficient elements of intimidation so that Scott could sensibly have considered himself at risk. Additionally, Victor's verbal communications during the incident, which were circumscribed to telling Scott that he "talked too much in the federal court" and to conjecturing that the second television set could be some form of surveillance equipment, clearly conveyed the message that his visit arose out of a concern for Scott's cooperation with the federal authorities. Finally, the firing of a shot in the hallway of the apartment building and the remark that "the next one [was] for [Scott]" completed Victor's statement to Scott that providing information about him to the federal authorities could carry fatal consequences.

■ The principal argument advanced by appellant deserves no credit. Based on the facts that Scott's prior testimony to the grand jury involved only illegal gambling, which Victor was not involved in, and Stephanie Wright's testimony that Scott told her Victor's visit was to collect on a debt arising from their prior drug dealings, Victor submits that his threats to Scott pertained only to their previous drug transactions. Victor's drug involvement, however, would also have given him a motive to ensure that Scott (as a person with a reputation for having cooperated with the federal authorities) would not pass along information about their drug dealings in a similar fashion, regardless of the substance of Scott's prior testimony before the grand jury. As for Stephanie Wright's testimony, we recall that credibility determinations are eminently within the jury's domain. See, e.g., United States v. Piedrahita–Santiago, 931 F.2d 127, 130 (1st Cir.1991). The jurors might have either disbelieved her or they might have considered the explanation to have been fabricated by Scott himself. In any event, while Victor's statement to Scott regarding Scott's grand jury appearances does not necessarily discount Victor's theory that the purpose of his threats related to their drug dealings, other statements made by Victor that night, such as his remark that the television set could be some type of surveillance device, indicated that he was mainly concerned with Scott's cooperation with the federal authorities. In the final analysis, the relevant question is whether the jury could have reasonably concluded that Victor knew of Scott's appearances before the grand jury and paid him a visit to threaten him with the intention of preventing further testimony in a federal proceeding. Finding that it could, we reject appellant's attack on the sufficiency of the evidence supporting his conviction.

As a second assignment of error, appellant points to the following incident which took place during the third day of trial. The government called Dana Richardson, the defendant's hairstylist, to the witness stand. Richardson's counsel had indicated to the Assistant U.S. Attorney that his client was angry and would, at some point, invoke his Fifth Amendment rights. The

government had prepared an immunity request, yet did not intend to present it to the court until Richardson was asked substantive questions concerning his relationship with the defendant because it "did not anticipate that the privilege would be invoked in response to preliminary questioning." After answering a question through which he admitted that he was appearing only after having been arrested by the F.B.I. on a material witness warrant, Richardson stated: "At this point in time, I wish to invoke my Fifth Amendment rights and privileges not to testify because of the testimony that I may give, that it may incriminate myself." Thereafter, Richardson was immunized and testified fully. Appellant now claims that the government knowingly and intentionally employed this tactic, and that the prejudice arising therefrom requires reversal.

▮ Where the government has sufficient reason to believe that a witness may invoke his or her Fifth Amendment rights in response to questioning, the better practice requires that the prosecutor so inform the court, thus allowing for a *voir dire* to be conducted out of the presence of the jury to determine "reliably that the witness will claim the privilege and the extent and validity of the claim." *United States v. Johnson,* 488 F.2d 1206, 1211 (1st Cir.1973); *see also United States v. Newton,* 891 F.2d 944, 952 (1st Cir.1989). This is so for the simple reason that the refusal of a witness to answer a specific question, particularly in the context of cross-examination, could lead a jury to draw impermissible inferences from which neither side has a right to benefit. *Johnson,* 488 F.2d at 1211; *cf. Robbins v. Small,* 371 F.2d 793, 795 (1st Cir.1967). Not every failure to follow this procedure, however, creates reversible error. As the leading case in this area of the law explains, *see Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), to determine whether reversible error results from a witness' assertion of his or her Fifth Amendment rights in the presence of the jury, courts must conduct two distinct inquiries:

First, ... error may result from prosecutorial misconduct when the government makes a "conscious and flagrant" attempt to buil[d] its case out of inferences arising from the witness' assertion of the Fifth Amendment-privilege. 373 U.S. at 186, 83 S.Ct. at 1154. Second, ... in the circumstances of a given case, [reversible] error may be committed where inferences from a witness' refusal to answer add critical weight to the prosecution's case. *Id.* at 187, 83 S.Ct. at 1155.

*Zeigler v. Callahan,* 659 F.2d 254, 271–72 (1st Cir.1981) (quoting *Namet,* 373 U.S. 179, 83 S.Ct. 1151); *see also Newton,* 891 F.2d at 952; *Labbe v. Berman,* 621 F.2d 26, 28 (1st Cir.1980). In applying the *Namet* test to particular cases, courts have generally considered: the prosecution's intent in calling the witness; the number of questions which elicit an assertion of the privilege; whether either side attempted to draw adverse inferences in closing argument or at any time during the trial from the witness' refusal to testify; whether the inferences relate to central issues or collateral matters; and whether the inferences constitute the only evidence bearing upon the issue or are cumulative of other evidence. *See Zeigler,* 659 F.2d at 272. With these principles in mind, we turn to evaluate the situation at bar.

▮ In the instant case, the prosecutor did not inform the court, as the case law requires, that the witness had manifested his intention of refusing to testify on self-incrimination grounds. However, the fact that a prosecutor calls a witness that he or she may have reason to believe would at some point invoke his or her Fifth Amendment rights does not, without more, constitute prosecutorial misconduct. *See Namet,* 373 U.S. at 188, 83 S.Ct. at 1155 ("[T]he prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous."). Rather, the circumstances surrounding each particular case must be examined to determine whether an improper consideration motivated the government's conduct. The prosecutor in this case had in fact prepared an immunity application for the witness, which was immediately presented to the court after the Fifth Amendment claim was raised. Such

conduct provides some indication of good faith on the government's part. *See United States v. Quinn,* 543 F.2d 640, 650 n. 6 (8th Cir.1976) (fact that prosecutor had intended to immunize witness is evidence of government's good faith). Moreover, the government did not begin its examination of the witness by inquiring into his relationship with the defendant; to the contrary, the examination began, and the privilege was asserted in response to, a series of preliminary questions regarding the witness himself. Thus, it is clear that the prosecutor did not have the intention of calling the witness to the stand, having him assert his Fifth Amendment privilege, then be discharged, leaving the jury to speculate about the substance of his testimony. There having been no "conscious and flagrant" attempt by the government to build its case out of inferences arising from the refusal of the witness to answer posed questions, we find no prosecutorial misconduct in the case at bar.

■ Turning to the question of prejudice, we find that there was none in this case. Simply put, the assertion by the witness of his Fifth Amendment rights did not give rise to any inference which could have affected the case in any way. The privilege was asserted with no question pending, as the witness had already answered the question and his claim followed the court's denial of a belated objection by counsel. The witness was immediately immunized, testified fully, and was extensively cross-examined by counsel for the defense on the substance of his testimony. The examination thus diverged as little as possible from the normal course it would have followed had no Fifth Amendment objection been raised. Richardson's testimony was in any event collateral to the government's case, as the evidence he provided was cumulative on the fact that he had seen Victor in possession of a handgun similar to the one he was seen carrying on January 29, 1990. The privilege was only asserted once and no references to the incident were made by the prosecution throughout the rest of the trial, including closing arguments. We must conclude, then, that this was not a case where inferences from a witness' refusal to answer added critical weight to the prosecution's case.

*Affirmed.*