STATE OF NEBRASKA, APPELLEE, V. ALVIN G. MORRIS, APPELLANT.

533 N.W.2d 110

Filed June 13, 1995.   No. A-94-828.

Christopher E. Kelly, of Fellman, Moylan, Natvig, Steichen & Kelly, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

SIEVERS, Chief Judge, and MILLER-LERMAN and INBODY, Judges.

SIEVERS, Chief Judge.

As the result of a jury trial in the district court for Douglas County, Alvin G. Morris was convicted of manslaughter in

connection with the death of Gregory Kowal. Morris was subsequently determined to be a habitual criminal and was sentenced to a term of incarceration of 20 to 25 years, with credit for 335 days served. Morris appeals his conviction to this court and assigns numerous errors. For the reasons cited below, we affirm.

## FACTS

On August 13, 1993, at approximately 9:30 p.m., the victim, Kowal, met three friends at Three Cheers, a bar in Omaha, Nebraska. That evening, Kowal cashed a $50 check at the bar and was seen wearing a gold watch and a Black Hills Gold ring. A friend of Kowal, Gregory Bourne, testified that Kowal had driven to the bar himself that night in his blue Geo Metro. Bourne also testified that Kowal smoked Camel filter cigarettes. Kowal left the bar alone around midnight and was later seen at Gilligan's, another bar in Omaha, located approximately four to five blocks from Kowal's apartment. Kowal told the bartender there that he was going to have one drink and then go home; however, the bartender did not see Kowal leave the bar.

A body, later identified as Kowal's, was discovered Saturday morning, August 14, on the steps outside a home near 35th and Parker Streets in Omaha. Kowal's body was first seen at approximately 6:30 a.m. However, the police were not called until 8:30 a.m. James Wilson, a City of Omaha police officer assigned to the homicide-assault unit, testified that based on his investigation, Kowal's body had been in that location anywhere from 6 to 8 hours. Police did not find any cash, a watch, or other jewelry on the body.

Blaine Rothman, a pathologist, performed an autopsy on Kowal and testified that the cause of Kowal's death was a single stab wound to the chest which penetrated the right side of the heart. In addition to the stab wound, Rothman found recent facial injuries, including a blackened right eyelid, an abrasion on the forehead, and a swollen lip. Rothman testified that a stab wound such as he found would cause a person to lose consciousness in 20 to 30 seconds and that death would occur in 2 to 3 minutes. Rothman further testified that a blade of 6

inches or more would have the capacity to cause the injury sustained by Kowal. A chemical analysis of Kowal's blood revealed that he was intoxicated at the time of his death, with a blood alcohol level of .218 gram per 100 milliliters.

On the same Saturday that Kowal's body was found, Virgil Combs, a U.S. Postal Service employee, saw a blue Geo Metro hidden in weeds in an alley near 17th and Lake Streets in Omaha at about 1 or 1:30 p.m. Since he suspected that the vehicle was stolen and would soon be stripped, Combs notified the police of the vehicle's location. At the time Combs saw the vehicle, the windows were intact and all tires were on the vehicle. At approximately 4 p.m., Omaha police officer Robert Sedlacek investigated the blue Geo Metro in the area of 17th and Lake Streets. Sedlacek noticed that the doors of the vehicle were locked, the windows were intact, and all four tires were still on the vehicle. However, Sedlacek noticed that the vehicle's radio was missing. Sedlacek ran a check on the vehicle and determined that the owner of the vehicle was Kowal. However, because the vehicle had not been reported stolen, Sedlacek determined that he did not have enough cause to tow it. Sedlacek returned to the area to check on the vehicle at approximately 10 p.m. At that time, the back window of the vehicle had been smashed in and all four tires had been removed. Although the vehicle still had not been reported stolen, Sedlacek decided to have the vehicle towed for safekeeping. As the vehicle was being prepared for towing, Sedlacek received a report that police were looking for a blue Geo Metro which was owned by the victim of a recent homicide. At that point, Sedlacek stopped the tow order and secured the scene where the vehicle was located.

In the area where the car was found, police investigators found some clothing items, registration papers, empty cigarette packages, and Camel "coupons." A fingerprint impressed on a Camel coupon found in the area where the blue Geo Metro was located was later identified as an exact match of Morris' left ring finger.

David Costello of the Omaha Police Division testified that a Kenwood cassette player was pawned at Cashmaster Loans pawnshop at approximately 12:20 p.m. on August 14, 1993, by

Raymond Thomas. Thomas is Morris' brother. Kowal's friend Bourne testified at trial that Kowal had a Kenwood cassette player installed in the blue Geo Metro.

Sheila Toles testified that on August 14, 1993, at her boyfriend's request, she gave Thomas and Morris a ride to an area near 17th and Lake Streets "to pick up [their] tires." Upon arrival, Toles saw a blue Geo Metro. Morris told Toles that he had been in the car the night before. Although Toles remained in her car, she heard the sound of glass breaking and saw Morris and Thomas put four tires in her trunk. After an unsuccessful attempt to pawn the tires, Toles took the men and the tires to their sister's house at around 6:20 or 6:30 p.m.

Walter Bray, a twice-convicted felon, testified at trial under a grant of immunity from further prosecution save the robbery charge arising out of this incident for which he was awaiting trial at the time of his trial testimony. We recount Bray's testimony in extensive detail. In August 1993, Bray had no permanent address but had been staying with some friends in a vacant apartment building. At approximately 11 p.m. on August 13, near 18th and Leavenworth Streets, Bray came across Morris. Although Bray had not seen Morris for approximately 4½ years, he recognized Morris when he saw him that evening. Morris suggested to Bray that they "go make some money" and asked Bray to come along and "watch [his] back." Bray testified that he was under the impression that they were going to "hustle fags or . . . [r]ip them off some type of way." Morris and Bray spotted a man sitting in a car by himself near Gilligan's. Morris approached the driver and made him get out of the car and empty his two front pockets. Bray identified pictures of Kowal and the blue Geo Metro as the person and vehicle they approached near Gilligan's. When Morris saw that his pockets were empty, he pushed Kowal into the backseat of the car. Bray also saw Morris pick up a watch from the ground right by the driver's door of the vehicle and saw Morris take Kowal's wallet from Kowal's back pocket. Morris got into the front seat of the car and told Bray to get into the backseat with Kowal.

Bray testified that as Morris drove north on 18th Street, Morris asked Kowal, "[W]here is the fucking money at[?]"

Kowal stated that he did not have any money on him and that they would have to go to his apartment to get it. Kowal gave an address that sounded to Bray like it was located in west Omaha. Morris called Kowal a liar and stated that the address given was an "address where cops live at." Morris also made Kowal give him the ring he was wearing. Morris continued driving, and at some point Kowal stated that "you guys will never get away with this." About 15 seconds later, Kowal tried to grab Morris around the neck. Bray reached to grab Kowal, and Kowal turned and started fighting with Bray. Bray "popped" Kowal in the face a "couple times" and then grabbed his hands to subdue him.

Morris next told Kowal that "if you don't tell me where this fucking money's at . . . I'm going to have to stop this car and I'm going to cut your fucking nuts off." At this point, because he was concerned that something worse was going to happen, Bray asked Morris to let him out of the car. Morris continued driving until he reached the area of 33d and Blondo Streets, where he stopped the car and told Bray that this is where he could get out. As Bray started getting out of the car, Kowal started crying, told Morris that he just wanted to get out now, and asked if Morris was going to kill him. When he got out of the car, Bray saw something that looked like a steak knife in Morris' hand. Bray could tell that it was not a pocketknife and that the blade was about 6 inches long and looked silver. Before he left, Morris told Bray to come by his mother's home at 16th and Corby Streets the next day. Bray denied stabbing Kowal or having in his possession any of the items which he said Morris took from Kowal.

Bray testified that the following day, near 17th and Lake Streets, he saw Morris with Thomas stripping Kowal's car. Bray testified that around 3 p.m., he saw Morris and Thomas take the tires and the radio from the car. Bray did not talk to Morris at that time. However, 2 or 3 days later, Bray saw Morris and Thomas about to enter Sol's Pawn Shop. At that time, Bray asked Morris about Kowal by asking, "[W]hatever happened with that guy that you was with when I left[?]" Morris told Bray, "[M]an, I had to do him." Bray testified that he took this to mean that Morris had to kill him. Morris told Bray, "I had to

do it, man, because that faggot mother fucker was coming back on us." Morris also said, "[D]on't worry about it, man. . . . [W]e ain't got nothing to worry about, man. . . . I took and I cleaned the car up and everything." Morris also warned Bray, "[D]on't tell nobody about this. This is something that we got to die and take to our grave with us."

The last time that Bray saw Kowal alive was when he got out of the car at 33d and Blondo. Bray testified that Blondo is one block north of Parker. Kowal's body was found near 35th and Parker.

After Bray and Morris were both arrested and held in jail in connection with this incident, Bray encountered Morris several times. Each time Morris told Bray to be quiet and that "[t]hey ain't got nothing on us. Just be quiet."

Officer Wilson testified that after Morris was brought in for questioning with regard to Kowal's death, Morris told police that "you probably got me all over that car but I didn't have anything to do with the homicide." Morris also admitted to Wilson that he and his brother had removed the stereo and tires from a vehicle at 17th and Lake Streets, pawned the stereo, and sold the tires to an individual. Morris told Wilson that as he was walking toward his mother's house on Saturday morning, August 14, he saw the blue vehicle belonging to Kowal. Morris went to his mother's house, contacted Thomas, and made preparations to go over and take items from the car. Morris told Wilson that they removed and pawned the car stereo first and then later returned to remove the vehicle's tires. Morris denied to Wilson that he had any knowledge of the homicide.

Morris was charged with first degree murder, use of a knife to commit a felony, and being a habitual criminal. Morris was found guilty of manslaughter and was acquitted of the weapons charge. At an enhancement hearing, Morris was found to be a habitual criminal and was sentenced to 20 to 25 years' imprisonment for the manslaughter conviction. This appeal followed.

## ASSIGNMENTS OF ERROR

On appeal to this court, Morris assigns the following errors: (1) The trial court erred in submitting the case to the jury as

there was insufficient evidence upon which to base a conviction, (2) the trial court erred in allowing the prosecutor to call Thomas as a witness when the State knew in advance that Thomas would refuse to testify and would assert his Fifth Amendment right against self-incrimination, (3) the trial court erred in admitting a videotape of Kowal's body into evidence, and (4) the trial court erred in allowing out-of-court statements of Thomas into evidence.

## STANDARD OF REVIEW

■ In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Parks*, 245 Neb. 205, 511 N.W.2d 774 (1994).

■ A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the verdict. Moreover, on such a claim, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Cook*, 244 Neb. 751, 509 N.W.2d 200 (1993).

## ANALYSIS

*Failure to Dismiss Case Based on Insufficient Evidence.*

Morris first argues that since there was insufficient evidence to present a jury issue in this case, the trial court erred in overruling his motion to dismiss. Morris made a motion to dismiss at the close of the State's evidence. After the trial court overruled this motion, Morris presented his defense through the testimony of his mother. Morris did not renew his motion to dismiss or make a motion for directed verdict after he rested.

■ The Nebraska Supreme Court has previously held that a defendant who moves for dismissal or a directed verdict at the close of the evidence in the State's case in chief in a criminal

prosecution, and who, after the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge the trial court's overruling of the motion for dismissal or for a directed verdict, but may challenge sufficiency of the evidence for the defendant's conviction. *State v. Huebner*, 245 Neb. 341, 513 N.W.2d 284 (1994). Since Morris elected to present evidence in his defense after his motion to dismiss was overruled, he waived his right to challenge on appeal the trial court's ruling on his motion to dismiss.

On appeal to this court, Morris does not separately assign error with regard to the sufficiency of the evidence to sustain his conviction. However, our extensive review of the record reveals that the evidence is sufficient to support the jury's verdict. In fact, the trial testimony of Bray alone, if believed by the jury, is sufficient evidence to sustain Morris' conviction.

## *Witness Invoking Fifth Amendment Right in Jury's Presence.*

Morris also maintains that the trial court erred by allowing the prosecution to call Thomas to testify before the jury when the State knew he would refuse to testify and would invoke his Fifth Amendment right against self-incrimination. The record of proceedings outside the jury's presence reveals that early in the investigation of Kowal's death, Thomas made a statement to police that implicated Morris in the crime. However, Thomas subsequently recanted this statement by an affidavit. Prior to trial, Morris made an oral motion in limine seeking to exclude the testimony of Thomas. Morris argued that if the prosecution called Thomas as a witness, it would be doing so for the purpose of getting otherwise inadmissible information to the jury through impeachment testimony. Morris argued that this would be done in bad faith, since the State was on notice that Thomas intended to refuse to testify.

During the trial, but outside the presence of the jury, the prosecutor informed the trial judge that Thomas had appeared pursuant to subpoena. The prosecutor asked for a hearing, outside the presence of the jury, to determine Thomas' intentions with regard to his testimony. The prosecutor also made a motion for the trial court to grant Thomas immunity, in

the event Thomas elected to invoke his Fifth Amendment rights. Still outside of the presence of the jury, Thomas informed the judge that he intended to refuse to answer any questions on Fifth Amendment grounds even if he were granted immunity from prosecution. The trial judge granted Thomas immunity.

The trial judge overruled Morris' motion in limine and, over defense counsel's objection, sustained the prosecution's motion to have Thomas invoke his Fifth Amendment rights in front of the jury. In the presence of the jury, Thomas answered the prosecutor's questions with regard to his name, age, and the fact that he was Morris' brother. After these preliminary questions, Thomas refused, as he had done in chambers, to answer any questions on Fifth Amendment grounds. The trial judge then reminded Thomas that he had been granted full immunity from any possible prosecution that could be made against him from his testimony. The following question and answer then took place:

> Q. [Prosecutor] Did you have a conversation with your brother, Alvin Morris, regarding the homicide of Gregory Kowal?
>
> A. [Thomas] Yeah. And I respectfully refuse to answer the question for the reason it may incriminate me, and I assert my right against compulsory self-incrimination under the Fifth Amendment to the US Constitution and Article I, Section 12, of the Constitution of Nebraska.

Thomas was immediately held in contempt of court, and the trial judge ordered the sheriff to take him into custody, which was done in front of the jury.

Morris now argues on appeal that "[t]he jury in this case was allowed to draw inferences of guilt against the Appellant when his brother was called to the stand and refused to answer ['because it may incriminate me'] when asked about the involvement of the Defendant in the death of Kowal," which "clearly worked to the prejudice of the Appellant." Brief for appellant at 29.

We do not find any Nebraska cases which directly address whether reversible error is committed when the prosecution calls a witness who it knows will take the Fifth Amendment.

However, there is instructive case law from other jurisdictions. The U.S. Supreme Court has held that to determine whether reversible error occurs as the result of a witness' assertion of his or her Fifth Amendment rights in the presence of the jury, courts must conduct two inquiries:

> First . . . error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. . . . [S]econd . . . in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case.

*Namet v. United States*, 373 U.S. 179, 186-87, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963). Given the detailed presentation of interlocking evidence showing Morris' involvement in Kowal's death, and the single question posed to Thomas before the jury, we hold that the first category of inquiry detailed in *Namet* is not involved in this case.

In *United States v. Quinn*, 543 F.2d 640 (8th Cir. 1976), an appeal of a conviction for jury tampering, the defendant argued, inter alia, that the trial court erred when it overruled his motion for mistrial when a witness was called to the stand and invoked his privilege against self-incrimination in the presence of the jury. Through his attorney, the witness, Frank J. Ryan, informed counsel for the government before trial that he would refuse to testify on Fifth Amendment grounds unless he was granted immunity. However, when Ryan was called to testify at trial, he had not yet been granted immunity from further prosecution. When called, Ryan answered questions with regard to his name and address. At that point, the trial judge intervened and advised Ryan of his privilege against self-incrimination. When Ryan was asked another question by the government, he immediately invoked the Fifth Amendment. In chambers, the defendant moved for dismissal of the charge or, in the alternative, for a mistrial. After taking the matter under advisement, the trial judge overruled the motion for mistrial. After additional proceedings in chambers, Ryan was granted immunity. Thereafter, Ryan testified in front of the jury after the judge instructed the jury that it should give

no consideration to Ryan's original refusal to testify.

■ On appeal, the defendant argued that he was prejudiced by Ryan's claim of privilege in front of the jury. The defendant contended that the government knew that Ryan would invoke the Fifth Amendment and that having Ryan claim this privilege in front of the jury was an act of bad faith that was done with the intent to prejudice the defendant. The Eighth Circuit Court of Appeals held that

> [i]n the course of a criminal trial before a jury, the act of a federal prosecutor in calling a witness to the stand with advance knowledge that the witness will invoke the fifth amendment may or may not call for a mistrial; each case must be decided in the light of its own facts and circumstances, and consideration must be given to the motive of the prosecutor in calling the witness and to the likelihood of the jury drawing unwarranted inferences against the defendant from the fact that the witness has declined to testify on constitutional grounds.

*United States v. Quinn*, 543 F.2d at 650. The *Quinn* court upheld the decision of the district court and held that under the facts and circumstances of that case, the episode involving Ryan's claim of privilege before the jury did not call for a mistrial either on a theory of prosecutorial misconduct or on a theory of actual or potential prejudice.

In *U.S. v. Victor*, 973 F.2d 975 (1st Cir. 1992), the defendant was charged with and convicted of tampering with a federal witness in violation of 18 U.S.C. § 1512(b). On appeal, in addition to claiming that the evidence was insufficient to support his conviction, the defendant argued that the assertion by a witness of his Fifth Amendment rights before the jury constituted reversible error. Counsel for witness Dana Richardson informed the assistant U.S. attorney before trial that Richardson was angry and "would, at some point, invoke his Fifth Amendment rights." *U.S. v. Victor*, 973 F.2d at 978. Although the government had prepared an immunity request for Richardson, the government did not intend to present it to the court until Richardson was asked substantive questions about his relationship with the defendant, since the government " 'did not anticipate that the privilege would be invoked in

response to preliminary questioning.' " *Id.* at 979. At trial, after answering a preliminary question, Richardson invoked his Fifth Amendment rights and refused to testify further. At that point, Richardson was immunized and testified fully.

On appeal, the defendant argued that the government's knowing and intentional tactic of calling Richardson to the stand to invoke his Fifth Amendment rights prejudiced the defendant and was reversible error. Applying the test stated in *Namet v. United States*, 373 U.S. 179, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963), the First Circuit Court of Appeals set forth other factors that may be considered in determining whether reversible error has occurred as the result of the prosecution's forcing, and the trial court's allowing, a witness to assert his or her Fifth Amendment rights in the presence of the jury, including

> the prosecution's intent in calling the witness; the number of questions which elicit an assertion of the privilege, whether either side attempted to draw adverse inferences in closing argument or at any time during the trial from the witness' refusal to testify; whether the inferences relate to central issues or collateral matters; and whether the inferences constitute the only evidence bearing upon the issue or are cumulative of other evidence.

*U.S. v. Victor*, 973 F.2d at 979. The *Victor* court concluded that under the facts and circumstances of that case, there was no prosecutorial misconduct, since there was no conscious and flagrant attempt by the government to build its case out of inferences arising from Richardson's refusal to testify. The court also found that Richardson's assertion of his Fifth Amendment rights did not "give rise to any inference which could have affected the case in any way" and did not add "critical weight to the prosecution's case." *U.S. v. Victor*, 973 F.2d at 980.

In the present case, it is clear that the prosecutor was aware that Thomas would refuse to testify even if immunized, and we cannot discern from the record what the prosecutor's motive may have been for having Thomas invoke his Fifth Amendment rights in the presence of the jury. The prosecutor's explanation to the trial judge that he would then be able to treat Thomas as a

"hostile witness" does not enlighten us, since treatment as a hostile witness merely allows use of leading questions in examining a witness one has called to testify. See Neb. Evid. R. 611(3), Neb. Rev. Stat. § 27-611(3) (Reissue 1989). However, such treatment presupposes that the witness will answer— which was clearly not going to be the circumstance here with Thomas.

Under the facts and circumstances of this case, we decide this assignment against Morris on two grounds: (1) the lack of prejudice and (2) Morris' failure to request a mistrial. By this stage of the trial, the jury already knew that Thomas and Morris were brothers and that Thomas had pawned the Kenwood cassette player that had been removed from Kowal's vehicle. Against this backdrop we examine the question put to Thomas before the jury: "Did you have a conversation with your brother, Alvin Morris, regarding the homicide of Gregory Kowal?" This question did not present any specific information to the jury, except that Thomas voluntarily answered "yeah" before claiming the privilege. As stated previously, there was no attempt by the prosecution to build its case from inferences from this one question and Thomas' exercise of the Fifth Amendment privilege. Moreover, in the context of the detailed evidentiary presentation by the prosecution, we cannot conclude that "critical weight" had been added to the State's case by Thomas' presence on the witness stand, his invocation of the Fifth Amendment, and the trial court's holding him in contempt. See *Namet v. United States, supra.* We also look to whether this was the only evidence on the subject or whether it was cumulative of other evidence. See *U.S. v. Victor*, 973 F.2d 975 (1st Cir. 1992). The answer to these questions is clearly that there was other evidence on the issue and that Thomas' testimony would have been cumulative.

The record also shows that Morris' defense counsel expressed concern at trial that the prosecution was acting in bad faith and was trying to put itself in a position to be able to impeach Thomas' testimony with prior inconsistent statements. However, the record shows that the State made no attempt to introduce prior inconsistent statements of Thomas after he

refused to testify.

Moreover, the potential inferences from the trial events involving Thomas' invocation of his Fifth Amendment privilege in front of the jury are (1) that Thomas was involved in Kowal's death and was protecting himself or (2) that he was protecting his brother. Thus, we believe that Morris must move for a mistrial to preserve any claim of error rather than hope that the jury would draw the inference that Thomas rather than Morris was responsible for Kowal's death. If Morris decided to take that gamble and did not move for a mistrial, he cannot be heard to complain on appeal when the jury appears to have chosen the other inference or has not accorded any weight whatsoever to Thomas' appearance.

■ When a party has knowledge during a trial of irregularity or misconduct, he must timely assert his right to a mistrial. *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991) (objection was made and sustained as to volunteered testimony, but motion for mistrial after witness left stand found not timely). We find no prejudice to Morris and no reversible error in the trial court's allowance of Thomas' brief appearance before the jury. Moreover, in these particular circumstances, a motion for a mistrial was necessary to preserve the matter for appellate review. Thus, for several reasons, this argument lacks merit.

*Videotape of Victim's Body.*

Morris assigns error with regard to the trial court's showing of a videotape of Kowal's body to the jury over Morris' objection. The videotape, shot by the Omaha Police Division as part of their investigation of the homicide, shows the body of the victim and the location of the body when it was found. The trial court allowed the videotape to be shown to the jury, over objection, during the testimony of Officer Wilson, to illustrate his description of the scene and the body. Morris argues that the prejudicial effect of the videotape far outweighed its probative value.

■ While we were unable to find any Nebraska cases that deal directly with the issue of the admissibility of a videotape depicting the condition of a victim's body at a crime scene, we

find that the law with regard to the admissibility of gruesome photographs is obviously analogous. Under Nebraska law, the admission of photographs of a gruesome nature rests largely within the discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect. *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993).

In *State v. Hankins*, 232 Neb. 608, 625, 441 N.W.2d 854, 869 (1989), we find further guidance on this subject:

> We have held that in a homicide case photographs of the victim are admissible, even if gruesome, provided a proper foundation is laid and they are received for purposes of identification, to show the condition of the body or the nature and extent of the wounds, or to establish malice or intent, particularly in conjunction with the examining pathologist's testimony. *State v. Parsons*, 226 Neb. 543, 412 N.W.2d 480 (1987); *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983). In other words, the gruesome nature of photographs alone will not keep them from the trier of fact, so long as the probative value is not outweighed by the prejudicial effect. *State v. Parsons, supra*.

After viewing the videotape, we conclude that the probative value is not substantially outweighed by its prejudicial effect. The tape corroborates Bray's testimony that Kowal was struck in the face while in the vehicle with Morris and also corroborates other aspects of the State's proof, such as the pathologist's testimony about the cause of death, the type of weapon used, and how long Kowal had been dead. The trial court correctly admitted the videotape into evidence.

*Out-of-Court Statements of Thomas.*

Morris also argues that the trial court erred in allowing the State to present an out-of-court statement of Thomas. Officer Wilson, when testifying about Morris' response when interrogated about the crime, was allowed to testify that Thomas had made statements to the police implicating Morris in the death of Kowal. Morris asserts that such testimony was inadmissible hearsay and that the trial court erred by overruling Morris' objection to this testimony.

At trial, Wilson was questioned with regard to his postarrest interview with Morris. Specifically, in response to a question from the prosecutor, Wilson answered:

A. Raymond or, I'm sorry, Alvin didn't believe when I told him — or when he made his denials to me of having anything to do with the actual homicide of Mr. Kowal, I again reiterated the fact to him that we had physical evidence to show that we could connect him with the car and also statements from his brother implicating him.

[Defense counsel]: Objection at this time, Your Honor, with regard to any statements by any other parties.

THE COURT: Overruled.

Thus, although Morris' objection was timely, the objection was not on any specific ground and clearly was not a specific hearsay objection as is now argued on appeal. Neb. Evid. R. 103(1)(a), Neb. Rev. Stat. § 27-103(1)(a) (Reissue 1989), states that an appellant claiming reversible error as the result of admission of evidence must have made "a timely objection . . . stating the specific ground of objection, if a specific ground was not apparent from the context." See *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992). Generally, a party is barred from asserting a different ground for an objection to the admission of evidence on appeal than was offered before the trier of fact. *State v. Jensen*, 238 Neb. 801, 472 N.W.2d 423 (1991). It is also true that an issue not properly presented to and passed upon by the trial court may not be raised on appeal. *State v. Foley*, 234 Neb. 304, 450 N.W.2d 694 (1990). Although Morris' counsel voiced a general opposition to Wilson's testimony, he did not state a specific objection based on any of the Nebraska Evidence Rules.

In *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989), the court considered the timeliness and specificity of defense counsel's objection, which was nearly identical to the objection at issue here. In *Cox*, the objection was made well in advance of the prosecutor's question to the witness, " 'What did he [the victim] tell you?' " *Id*. at 503, 437 N.W.2d at 140. In addition to finding that the objection was not timely as being made too early, the court implied that the objection failed to preserve the matter for appellate review because it was not specific enough:

Furthermore, counsel phrased the objection in the broadest possible terms, "any testimony of statements by any witness . . . not present in court." Given the all-inclusive nature and universality of counsel's objection, the district court had no choice but to overrule the objection. Under the Nebraska Evidence Rules, the hearsay rule does not require exclusion of all out-of-court or extrajudicial statements. See Neb. Evid. R. 803, Neb. Rev. Stat. § 27-803 (Reissue 1985). An extrajudicial statement must be examined to determine whether (1) it is hearsay defined by Neb. Evid. R. 801, Neb. Rev. Stat. § 27-801 (Reissue 1985), and (2) if hearsay, whether any exception to the hearsay rule authorizes admission of the statement into evidence. See, Neb. Evid. R. 803; Neb. Evid. R. 804, Neb. Rev. Stat. § 27-804 (Reissue 1985). To afford a trial court a fair opportunity to examine an out-of-court or extrajudicial statement in the light of the Nebraska Evidence Rules, counsel must direct a hearsay objection to the statement to be excluded pursuant to the objection. Failure to direct a hearsay objection to a particular extrajudicial statement, offered as evidence, may result in a waiver of the right on appeal to assert prejudicial error. See, *State v. Roggenkamp*[, 224 Neb. 914, 402 N.W.2d 682 (1987)]; *State v. Archbold*[, 217 Neb. 345, 350 N.W.2d 500 (1984)].

*State v. Cox*, 231 Neb. at 503-04, 437 N.W.2d at 140.

Despite its criticism of the objection in *Cox* on both timeliness and specificity grounds, the Supreme Court nonetheless proceeded to perform a "harmless error" analysis of the testimony, citing the rule that erroneous admission of evidence is harmless error and does not require reversal if the evidence erroneously admitted is cumulative and other relevant evidence, properly admitted or admitted without objection, supports the finding by the trier of fact. In *Cox*, a child abuse case, the police officer's testimony at issue was that the victim had stated, " '[D]addy poured hot water on [my] feet.' " *Id.* at 502, 437 N.W.2d at 139. The court recited that other witnesses had testified in detail regarding the defendant's disciplinary practice of placing the child in the bathtub and running hot

water on the child's feet. The court concluded its analysis by reasoning that even if the officer's testimony regarding the extrajudicial statement of the victim was excluded by the hearsay rule, testimony from other witnesses rendered the admission of this testimony about the cause of the child's burns an error which was harmless beyond a reasonable doubt.

In the instant case, we reach the same conclusion. The challenged testimony, in summary, was that Morris' brother had given a statement implicating Morris in Kowal's death. Other than the word "implicate," no other specifics were adduced as to what Thomas allegedly had said which implicated Morris. Additionally, there was abundant testimony from Bray which implicated Morris in the death of Kowal. Bray's testimony not only recited numerous admissions by Morris to Bray of involvement in the killing of Kowal, but also precise and detailed testimony of the events by which the paths of Bray and Morris came to meet with that of Kowal. Additionally, Bray provides evidence of the robbery, Bray's assault upon Kowal in the car, Morris' threats to Kowal, and Bray's observation of Morris with a knife which the pathologist testified was of the sort needed to inflict Kowal's fatal wound. Thus, even if the objection could be considered specific enough and the testimony inadmissible hearsay, neither of which we need decide, it would have been harmless error to allow Wilson's testimony, just as in *Cox*. Accordingly, the assignment lacks merit.

*Manslaughter Instruction.*

Finally, in our review of the record we noted that the jury instruction on manslaughter was as follows:

> The material elements which the State must prove by evidence beyond a reasonable doubt in order to convict the defendant of the crime of manslaughter are:
>
> 1. That the defendant killed Gregory A. Kowal;
>
> 2. That he did so, either:
>
> a. *intentionally* without malice upon a sudden quarrel, or
>
> b. unintentionally while in the commission of an unlawful act which consisted of intentionally, knowingly,

or recklessly causing bodily injury to Gregory A. Kowal. (Emphasis supplied.)

Under *State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994) (overruling *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989)), this instruction was erroneous, since there is now no requirement of an intention to kill in committing the crime of manslaughter in the State of Nebraska. However, since the erroneous intent element increased the burden on the State for proving manslaughter upon a sudden quarrel, we find no prejudice to Morris in the erroneous instruction, nor do we find any plain error.

## CONCLUSION

There being no merit to the assigned errors and no plain error on the record, Morris' conviction and sentence are affirmed in all respects.

AFFIRMED.